UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CARMEN A. BURGOS,

                              Plaintiff,

        v.                                                      **DECISION AND ORDER**
                                                                13-CV-704S
SOUTHEAST WORKS f/k/a SOUTHEAST
COMMUNITY WORK CENTER, INC.,

                              Defendant.

# I.      INTRODUCTION

Plaintiff, Carmen A. Burgos, brings this action against Defendant, Southeast Works f/k/a Southeast Community Work Center, Inc., under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, 42 U.S.C. §1981, and New York Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYHRL"), alleging that she was discriminated against based on her sex, age, and race. Southeast Works has moved for summary judgment, seeking dismissal of Burgos' claims under Federal Rule of Civil Procedure 56. For the reasons discussed below, Southeast Works' motion is granted in part and denied in part.

# II.      BACKGROUND[1]

Plaintiff Burgos is a black woman born in 1961. Defendant Southeast Works is a not-for-profit agency that provides services for adults with developmental disabilities and operates ten group home locations in Western New York. Southeast Works employed

---

[1] The facts are derived principally from the parties' Local Rule 56 Statements, the parties' declarations, and exhibits attached thereto. Only the facts necessary to the resolution of the motion are recounted below. The facts are undisputed unless otherwise stated.

Burgos as a Residential Trainer at its group home facilities from June 5, 2008, through May 21, 2012.  Residential Trainers provide instruction, supervision, and counseling to residents and participate in maintenance and housekeeping activities.

June 2008 through June 2009

Burgos initially held a part-time Residential Trainer position at Southeast Works' West Payne House location.  Burgos alleges that the environment at West Payne was racially charged and sexually abusive and that her supervisors took no action when she complained that her co-workers made racially discriminatory comments.  Burgos identifies Jennifer Tedesco and Jill Ryzda, younger white females who also worked as Residential Trainers, as the worst offenders at West Payne.  She alleges that Tedesco and Ryzda made numerous comments that were racially offensive, including encouraging one of the developmentally disabled clients to refer to Burgos and other black women as "black nigger bitches."  Burgos alleges that, when she informed a Residential Manager[2] of this behavior, he drew a picture of a black man behind bars and gave it to the client rather than taking any action to stop the behavior.  Burgos sought a scheduling change in late 2008 to distance herself from Tedesco and Ryzda, but alleges that she did not give the true reason for the requested change because she feared retaliation.

Burgos further alleges that, in July 2009, Residential Manager Jessica Cosgrove conducted a meeting at West Payne, in which Cosgrove stated that the house was divided between white staff and black staff, and that Tedesco was causing the division. Burgos alleges that Tedesco was disruptive during the meeting and, when Burgos

---

[2] Residential Managers have direct responsibility for the group homes, including the Residential Trainers. Residential Managers are supervised by Residential Coordinators.

complained about Tedesco's behavior, Cosgrove said Burgos should leave.

During this period (June 2008 through June 2009), Burgos alleges both facially neutral and discriminatory comments and actions. In addition to the examples given above, she also alleges that:

- Tedesco stated she did not want to drive a client to an appointment because there are too many black people in Buffalo.

- Another co-worker told Ryzda not to drive to Buffalo because black men would want Ryzda because of her long blonde hair.

- A male co-worker, whose hand had been dyed by a baseball mitt, told Burgos that now he was as black as she is.

- A male co-worker told Burgos to come to his house because he needs black friends now that there is a black president.

- A male co-worker rubbed his genitals on Burgos.

- Tedesco called Burgos' daughter (who is Muslim and wears a veil) a "towel-head."

July 2009 through December 2011

Burgos alleges that, because Cosgrove failed to correct the hostile environment at West Payne, she again sought to change her schedule. Burgos requested to move from part-time status to a "relief" position on May 15, 2009, and began the new position on July 1, 2009. Relief employees did not have regular hours and were not assigned to a specific location, but instead filled in when and where needed. As a relief employee, Burgos worked at a number of Southeast Works' other locations and alleges that she found discriminatory environments in each of them.

Some of the allegedly discriminatory comments and behavior were directed at Burgos. For example:

- In summer 2010, a white, male co-worker asked Burgos why black women have so much trouble with their hair and whether it made her mad when he called the cupcakes they were making "black cupcakes".

- Later in 2010, a white co-worker told another co-worker that she "better check [her] bank account," after giving Burgos her credit card to make a purchase, which Burgos understood was a suggestion that Burgos was likely to steal because she is black.

- In early 2011, Judith Shanley, CEO of Southeast Works, told Burgos that white residents' families did not want black employees caring for their family members.

- In February 2011, a white co-worker made a comment to Burgos implying that only blacks live in inner-city neighborhoods.

- Later in 2011, a co-worker, who had formerly worked as a prostitute in Buffalo, told Burgos that men preferred her over black prostitutes because she had long blond hair.

- In June 2011, a male co-worker suggested that Southeast Works should hire "some young white girls."

- In summer 2011, a younger co-worker told Burgos that, due to Burgos' age, Burgos was working more hours than she could handle, and that she was too old and slow to work.

- In December 2011, a Senior Residential Trainer, David Abston, asked Burgos, "Are you stupid? Do you know how to use a computer?" when Burgos had

trouble logging onto Southeast Works' system.

- Also in December 2011, Abston referred to a group of older women, which included Burgos, as the "hot flash corner."  Around that same time, Abston also made sexual comments to Burgos, telling her to "bend over, yeah, bend over" and telling Burgos that he had to pay his girlfriend for sex before she left him.

- A Residential Coordinator told a disabled resident that he did not have to work with Burgos because Burgos was old and invisible.

Other allegedly discriminatory incidents were overheard or reported to Burgos by other employees.  For example:

- A co-worker told Burgos that she had heard someone call Burgos a "nigger."

- In summer 2010, a Residential Manager told one of Burgos' co-workers that she was a good color for a biracial black girl.

- In 2011, a male co-worker asked a female co-worker:  "When are you going to give me some of that pussy?" and attempted to kiss her.

- In 2011, a black female co-worker overheard a shipping employee say that President Obama's face belonged on food stamps, not currency.

- In January 2011, Abston told a female Residential Trainer that he is so fat that he needs to grab his penis with both hands when he masturbates.

- In June 2011, a Hispanic co-worker was told that she should not be allowed to give speech therapy and ridiculed because of her accent.

- In fall 2011, a white female co-worker said that she would never date a black man.

- In December 2011, Burgos heard Abston calling a female resident a "bitch."

Burgos alleges that, when she reported many of these incidents to her supervisors, they ignored her, mocked her, or otherwise failed to take an appropriate action. For example, Burgos alleges she complained to Rose Cunningham, a Residential Manager, who told her that there would be "no talk of racial discrimination around here." And, when Burgos complained about Abston's comments regarding her inability to log onto the computer to Megan Calkins, a Residential Coordinator, Calkins took Abston's side, suggesting that Burgos' age, in fact, affected her computer skills.

January 2012 through May 2012

Burgos alleges that she made numerous complaints regarding Abston to Residential Manager Cherie Bender and to Residential Coordinators Calkins and Nicole Perry, which triggered retaliation in the form of being denied work. Burgos alleges that she worked regularly in 2010 and 2011 as a relief Residential Trainer, receiving shifts nearly every week, but that she was not given shifts between January 15 and May 6, 2012 because Abston controlled relief scheduling. It is disputed whether any relief shifts were available for Burgos. Southeast Works contends that Burgos was offered weekend shifts, which she turned down. Burgos alleges that weekday shifts were available, but that Abston improperly allowed male employees to work overtime rather than assigning the shifts to Burgos. Burgos began work again when two of her black female co-workers checked the schedule and informed Burgos that shifts were available. Burgos then called and was given the shifts. Southeast Works contends that Burgos could have called earlier to seek shifts; Burgos contends that Southeast Works had previously called her to assign shifts weekly, that she had never needed to seek shifts before, and that she was only able to receive assignments again because Abston

was on administrative leave.

On March 16, 2012, Burgos filed a charge against Southeast Works with the New York State Department of Human Rights ("DHR"), of which, Burgos alleges, Southeast Works' employees were aware. On April 24, 2012, Burgos attended a training session at Southeast Works. Burgos alleges that two of the presenters harassed and intimidated her during the training: Joseph Clem, who was conducting the training, stood directly behind Burgos and attempted to physically intimidate her; and Maureen Rivera, a nurse, made eye contact with Burgos while falsely stating that more heterosexual black women die from AIDS than any other demographic and that this is because HIV originated in Africa, and that the disease and was spread because Africans ate "monkey meat."

After this training, Burgos wrote a letter to Pamela Hayes, Executive Director of Southeast Works, complaining about Rivera and Clem. Burgos alleges that, after she made the complaint, some of Rivera's fellow nurses began to bully her and make threats. Burgos alleges that one of the nurses told Burgos that she knew drug addicts that would "take care of" people and used physically threatening body language and tone of voice when addressing Burgos. Burgos further alleges that Rivera brought a knife into the workplace and showed the knife to Burgos' friend, telling her that Rivera would use this weapon in the "hood." Burgos alleges that the nurses' behavior and loyalty to each other made her fear for her safety.

Burgos further alleges that she was contacted by the guardian of a developmentally disabled client who had heard from another Residential Trainer that a nurse was carrying a knife at work. Burgos alleges that she spoke to the guardian and

confirmed the rumor because part of her job was discussing client care, and this related to client care. The guardian wrote a letter to Southeast Works questioning the environment as being unsafe and discriminatory. The Chief Operating Officer of Southeast Works, Susan Mentecki, said that Burgos should be disciplined for her contact with the guardian, and that disciplining Burgos might help in resolving the DHR complaint.

Southeast Works contends that it made several attempts to meet with Burgos regarding her complaint about Rivera, but that Burgos refused to meet. Burgos alleges that she did not receive the initial invitation to meet (due to internal technological issues at Southeast Works) and that Southeast Works refused to accommodate her by meeting off-site or conducting a phone interview. Burgos alleges that she only refused to meet because she feared for her safety in the presence of Rivera. Burgos eventually spoke to Murphy by phone, on May 21, 2012. In that conversation, Burgos alleges that she told Murphy she feared for her safety and this, coupled with Southeast Works' failure to address the workplace harassment and discrimination, compelled her to resign.

Burgos alleges that Southeast Works also retaliated against other employees. She alleges that a black female employee was transferred to a different location when she complained that a white male employee called her "ghetto", while the white male employee was not disciplined. A different black female employee was issued a written warning for lack of professionalism shortly after she filed a complaint with DHR, though she had never previously been disciplined. Burgos also presents comparator allegations, giving examples of younger, non-black, and male employees to argue that

Southeast Works treated women, blacks, and older employees disproportionally worse.

## III.   LEGAL STANDARDS

"A motion for summary judgment may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010). A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Kaytor, 609 F.3d at 545 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2003) *cert. denied*, 540 U.S. 811, 124 S. Ct. 53, 157 L. Ed. 2d 24 (2003) (quoting Anderson, 477 U.S. at 248).

Title VII prohibits an employer from unlawfully discriminating against an employee because of an individual's sex or race, among other characteristics. See 42 U.S.C. § 2000e-2(a)(1). In addition, § 1981 "prohibits discrimination based on race in the making and enforcement of contracts," including employment contracts. Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998); see also Tolbert v. Smith, 790 F.3d 427, 436 (2d Cir. 2015) ("Refusing to award a contract or a material employment benefit for a discriminatory reason violates [§ 1981].").  Finally, the ADEA prohibits an employer from discriminating against or discharging an employee because of her age. See 29 U.S.C. § 623(a)(1). Except as noted, employment discrimination claims brought under Title VII, the ADEA, and § 1981 are generally analyzed under the same evidentiary framework.

See Lu v. Chase Inv. Servs. Corp., No. 07 Civ. 1256, 2009 WL 4670922, at *6-7 (S.D.N.Y. Dec. 9, 2009) ("Claims of employment discrimination under Section 1981 are analyzed under the same standard as Title VII claims."); Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 225-27 (2d Cir. 2004) (applying Title VII hostile work environment analysis to a hostile work environment claim under section 1981); Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 316-18 & n. 2 (2d Cir. 1999) ("The analysis of the hostile working environment theory of discrimination is the same under the ADEA as it is under Title VII.").

In the employment discrimination context, a court should take a "totality of the circumstances" approach and look to "the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000) (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). District courts must be cautious in granting summary judgment in employment discrimination cases because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited for summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (citing Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV. DISCUSSION

### A. NYHRL

Burgos makes five claims for relief under NYHRL, Counts 4, 6, 8, 10, and 12 of

the Amended Complaint.[3]  Southeast Works contends that, because Burgos elected to pursue an administrative charge before the DHR, she is precluded from litigating those claims here pursuant to the NYHRL "election of remedies" provision.  N.Y. Exec. Law § 297(9) ("[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction . . . unless such person had filed a complaint hereunder or with any local commission on human rights").  Burgos does not oppose this portion of Southeast Works' motion.

Here, Burgos' complaint to the DHR included claims of race discrimination, sex discrimination, age discrimination, sexual harassment, and retaliation—the same claims Burgos asserts in this lawsuit.  "When the [DHR] has issued a finding of no probable cause . . . plaintiff's claims . . . are barred by the [NYHRL] election of remedies provisions because [plaintiff] has already litigated the claims before the [DHR]."  Guardino v. Vill. of Scarsdale Police Dep't, 815 F. Supp. 2d 643, 646 (S.D.N.Y. 2011); see also Desardouin v. City of Rochester, 708 F.3d 102, 106 (2d Cir. 2013) ("The District Court properly ruled that [plaintiff's NYHRL] claim was barred on the basis of election of remedies," which "precludes resort to courts after claims have been filed with a local commission on human rights.").  Accordingly, Burgos' NYHRL claims are dismissed.

## B.    Statute of Limitations

Defendant has also raised the defense of statute of limitations.  Burgos' claims under Title VII and the ADEA are subject to a 300-day limitations period, running from the time that Burgos filed her administrative charge with the DHR on March 16, 2012.  See 42 U .S.C. § 2000e-5(e)(1); 29 U.S.C. §§ 626(d)(2), 633(b); Nat'l R.R. Passenger

_____
[3] The Motion for Summary Judgment incorrectly identifies only four claims under NYHRL.

<u>Corp. v. Morgan</u>, 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Burgos' race discrimination claim under § 1981 is subject to a four-year statute of limitations period from the time that the complaint was filed in this Court on July 3, 2013. <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 382-83, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). Accordingly, the limitations period for Burgos' Title VII and ADEA claims began on May 21, 2011 (300 days prior to the date the administrative charge was filed); and the limitations period for Burgos' § 1981 claims began on on July 3, 2009 (four years prior to the date the Complaint was filed).

Burgos contends that incidents prior to the limitations period should be considered by this Court because the earlier incidents are part of a continuing violation in her hostile work environment claims. "When, as in this case, a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct." <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 220 (2d Cir. 2004). "For statute of limitations purposes, incidents of employment discrimination must be categorized either as discrete acts or continuing violations." <u>Fleming v. Verizon N.Y., Inc.</u>, 419 F. Supp. 2d 455, 465 (S.D.N.Y. 2005) (citing <u>Morgan</u>, 536 U.S. at 114-16). "A discrete act of discrimination is time-barred if it occurred prior to the applicable limitations period," even if it relates to other timely filed charges. <u>Id.</u>; <u>see also</u> <u>Chin v. Port Auth. of N.Y. & N.J.</u>, 685 F.3d 135, 157 (2d Cir. 2012). Accordingly, any allegations of discrete acts that fall outside the relevant limitations period, including the allegation that Burgos was constructively demoted when she began working in a relief position on July 1, 2009, will not be considered on those claims.

However, hostile environment claims differ from claims based on discrete acts of discrimination because a hostile environment involves "repeated conduct" or the "cumulative effect of individual acts" and the "unlawful employment practice therefore cannot be said to occur on any particular day." Morgan, 536 U.S. at 115. Therefore, time-barred incidents "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." Id. at 112 (internal quotation omitted). Where "a plaintiff has experienced a continuous practice and policy of discrimination, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Washington v. County of Rockland, 373 F.3d 310, 317 (2d Cir. 2004) (internal alteration and quotation marks omitted). In McGullam v. Cedar Graphics, Inc., the Second Circuit outlined how to assess the timeliness of hostile work environment claims. 609 F.3d 70 (2d Cir. 2010). Courts should determine (1) "whether [the plaintiff] alleged any discriminatory act within the limitations period," and (2) whether the acts that took place within the limitations period were "sufficiently related to" acts outside of the limitations period "to be part of the same alleged hostile work environment practice." Id. at 76-77. Courts should make an "individualized assessment" of relatedness, considering whether "as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment." Id. at 77, 78 (quoting Rowe v. Hussmann Corp., 381 F.3d 775, 781 (8th Cir. 2004)). If the incidents are sufficiently related, then the acts that took place outside of the limitations period may be considered on the merits as part of the hostile work environment claim. See id.

There is no dispute that Burgos alleges incidents that fall within the statutory period and therefore meets the first prong of the McGullam test. However, Southeast Works contends that the incidents of harassment prior to May 21, 2011 should not be considered because Burgos' Amended Complaint contains no allegations that Burgos herself was harassed, discriminated against, or subjected to a hostile work environment between July 2009 and January 2011. Southeast Works further contends that there is little overlap between the individuals involved in the earlier period of harassment and those in the later allegations.

Discriminatory incidents, separated by a long gap, may sometimes be found insufficiently related for application of the continuing violations doctrine. For example, in McGullam, the Second Circuit found that a one-year interval between allegedly harassing incidents, "render[ed] less plausible the notion that the [incidents were] of a piece." 609 F.3d at 78. Similarly, a six-year gap has been held to be "too large for any reasonable application of the continuing violation exception." Redfern-Wallace v. Buffalo News, No. 12-CV-471, 2013 WL 3777139, at *2 (W.D.N.Y. July 17, 2013) (internal quotation omitted). Here, although Burgos did not include discriminatory incidents in her Amended Complaint or administrative charge for the period between July 2009 and January 2011 in which she was the target, she includes sufficient evidence in opposition to this motion to raise a material question of fact as to whether she continued to experience discrimination during that period. For example, she alleges that, in summer 2010, a white, male co-worker asked Burgos why black women have so much trouble with their hair and whether it made her mad when called cupcakes they were making "black cupcakes," and that, later that year, a white co-worker told another

co-worker that she "better check [her] bank account," after giving Burgos her credit card to make a purchase, which Burgos understood was a suggestion that Burgos was likely to steal because she is black.

Further, Burgos did allege, in both the Amended Complaint and the administrative charge, several incidents of discrimination directed at her co-workers during this period. Citing no precedent as the basis for its argument, Southeast Works contends that discriminatory acts that were not directed at Burgos herself should not be considered when evaluating whether the acts outside the limitations period should be considered "part of the same alleged hostile work environment practice." McGullam, 609 F.3d at 76-77. This would appear to contradict the rule set forth by the Second Circuit, which urges district courts to "focus[ ] on the nature of the workplace environment as a whole," and therefore allows consideration of instances of hostility even where a plaintiff is not the target. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) ("a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim"), superseded on other grounds by N.Y.C. Local L. No. 85 (enacted 2005); see also Perry v. Ethan Allen, Inc., 115 F.3d 143, 150 (2d Cir. 1997) (noting with approval that the district court allowed the plaintiff "to present evidence of an environment of sexual harassment, to the extent that she observed it, dating back to January 1989, i.e., six months earlier than any harassment of [plaintiff] herself").

Burgos has alleged incidents directed at her, as well as incidents directed at her co-workers, during the "gap" identified by Southeast Works. Further, the alleged incidents are all sufficiently related because they were similar in nature and severity,

McGullam, 609 F.3d at 77, 78, and because they followed the same pattern of discriminatory comments and incidents that supervisors ignored or failed to properly address. They can therefore be considered to be part and parcel of the hostile work environment. See Morgan, 536 U.S. at 120-21 (affirming finding that conduct was part of same actionable hostile work environment claim where the pre-and post-limitation period incidents "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers") (citation and alteration omitted). Accordingly, this Court will consider the alleged behavior outside the limitations period as part of Burgos' hostile work environment claims.

**C.    Hostile Work Environment**

Burgos contends that she was subject to a hostile work environment due to her sex, race, and age in violation of Title VII, the ADEA, and § 1981. Southeast Works argues that Burgos' allegations are not sufficiently severe or pervasive to establish a hostile work environment.

A hostile work environment exists where the work environment is permeated with discriminatory intimidation, ridicule and insult that are sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Harris v. Fork Lift Sys., Inc., 510 U.S. 17, 20, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). To prevail on a hostile work environment claim, the plaintiff must show both (1) that her work environment was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the condition of her employment, and (2) that a specific basis exists for imputing to the employer the conduct that created the hostile environment. Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996). When

evaluating a hostile work environment claim, courts should consider the totality of the circumstances, such as the frequency and severity of the conduct, whether it was physically or verbally threatening, and whether it unreasonably interferes with the employee's job performance.  Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014).  The plaintiff may show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment."  Cruz, 202 F.3d at 570 (internal quotation marks omitted).  The analysis has both "objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  Rivera, 743 F.3d at 20 (internal quotation omitted).

As noted above, "[t]he crucial inquiry focuses on the nature of the workplace environment as a whole, [so] a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim."  Cruz, 202 F.3d at 570; see also Schwapp v. Town of Avon, 118 F.3d 106, 111-12 (2d Cir. 1997) (plaintiff's second-hand knowledge of racially derogatory comments or jokes can impact work environment).  Nor is it necessary that "offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class" for those remarks to support a plaintiff's claim.  Id.  Even where Burgos herself "[was] not present or [was] not the target of some of [the] racial remarks, a jury plausibly could find that persistently offensive conduct created an overall 'hostile or abusive environment,' which exacerbated the effect of the harassment

[Burgos] experienced individually." <u>Id.</u> at 571 (quoting <u>Harris</u>, 510 U.S. at 21). Moreover, because "one type of hostility can exacerbate the effect of another," allegations of race-based, sex-based, and retaliation-based animosity can be considered by a factfinder when evaluating Plaintiffs' claims of a race, sex, and age-based hostile work environment. <u>Feingold v. New York</u>, 366 F.3d 138, 151 (2d Cir. 2004); <u>see also</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 150 (2d Cir. 2003) (holding that retaliation-based hostility could have exacerbated effect of race-based hostility in creating hostile work environment); <u>Daniel v. T & M Prot. Res., LLC</u>, No. 15-560-CV, 2017 WL 1476598, at *3 (2d Cir. Apr. 25, 2017) (summary order) ("The evidence that [plaintiff] was harassed on multiple fronts—because of his race, sex, and national origin—should also be considered when evaluating [his] work environment as a whole.").

1. <u>Sex-Based and Race-Based Discrimination</u>

Southeast Works argues that the hostile work environment claims must be dismissed because the allegations of discrimination within the relevant statutory periods were not sufficiently severe or pervasive to create an abusive working environment, and instead characterizes the allegations as petty workplace grievances. However, this Court has already found that the continuing violation doctrine applies and therefore the allegations from the entire period of Burgos' employment with Southeast Works' merit consideration.

Southeast Works is correct that anti-discrimination statutes are not a "general civility code," <u>see</u> <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 452 (2d Cir. 1999), and a few isolated incidents of "boorish or offensive use of language" are generally insufficient

to establish a hostile work environment.  See Benette v. Cinemark U.S.A., Inc., 295 F. Supp. 2d 243, 251-252 (W.D.N.Y. 2003).  However, making all inferences in Burgos' favor, the allegations of harassment here are of "such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse."  Fitzgerald v. Henderson, 251 F.3d 345, 358 (2d Cir. 2001) (internal quotation and emphasis omitted)).  Burgos has provided allegations of sex and race-based discrimination that are both severe and pervasive.  Some of the severe incidents include allegations that Burgos' co-workers encouraged a developmentally disabled client to call her and other black females "black nigger bitches," and that a male co-worker rubbed his genitals on Burgos.  See Rivera, 743 F.3d at 24 (noting that "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates"); Copantitla v. Fiskardo Estiatorio, Inc., 788 F. Supp. 2d 253, 301 (S.D.N.Y. 2011) (noting that "a reasonable jury could consider [an alleged harasser grabbing the plaintiff by the waist and rubbed his genitals against the plaintiff] sufficiently severe so as to alter the conditions of employment).  Indeed, taking into consideration all of the allegations made by Burgos, she "presents a persistent pattern of harassment that began as soon as [s]he was hired by [Southeast Works] and continued until [her resignation]."  Daniel, 2017 WL 1476598, at *3.

But, given the Second Circuit's "repeated[ ] caution[s] against setting the bar too high," Terry, 336 F.3d at 148, Burgos' claims would still survive even without the allegations that Southeast Works argues should be time-barred.  Burgos' co-worker, Abston, made sexually suggestive comments to Burgos and told Burgos and her female

co-workers explicit details of his sex-life. Abston and others also made pervasive comments to Burgos and her co-workers regarding their sex and race. Rivera singled Burgos out while falsely stating that more heterosexual black women die from AIDS than any other demographic and that this is because HIV originated in Africa, where Africans ate "monkey meat." Further, Burgos alleges that she was threatened and bullied after complaining of Rivera's behavior, including by Rivera bringing a knife into the workplace and saying she would use this weapon in the "hood." Burgos has sufficiently alleged a subjective fear arising from Rivera's actions. Moreover, based on Burgos' allegations of Rivera's prior comments and the fact that she brought a weapon to the workplace, Rivera's actions were such that a trier of fact could find that she created an objectively dangerous situation. Compare Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP, 915 F. Supp. 2d 498, 507 (S.D.N.Y. 2013) (finding plaintiff's fear could not be objectively reasonable where fear was based on single verbal confrontation, generalized anger, and hearsay allegations of verbal abuse from other co-workers, and where employer made efforts to separate plaintiff from the offending co-worker); Hicks v. Baines, 593 F.3d 159, 168 (2d Cir. 2010) (trier of fact could find situation objectively dangerous where plaintiff alleged punitive scheduling by being transferred to a facility housing a troubled youth who had previously threatened violence).[4]

Making all inferences in Burgos' favor and viewing the circumstances in their totality, this Court finds that this string of incidents "transcended coarse, hostile and

_____

[4] Citing Simmons-Grant, Southeast Works argues that this Court should not find an issue of material fact as to whether the situation was objectively dangerous because it made an attempt to separate Rivera from Burgos after Burgos complained. However, Burgos also alleges that Southeast Works attempt to investigate her complaint required her to be in the same building as Rivera, thereby raising a disputed fact as to whether Southeast Works truly attempted to separate Rivera from Burgos.

boorish behavior," see <u>Annis v. Cnty. of Westchester, N.Y.</u>, 36 F.3d 251, 254 (2d Cir. 1994), and strayed into the realm of alarming and threatening conduct. Whether the conduct that occurred was sufficient to alter Burgos' work environment is a factual question to be determined by the trier of fact.

Southeast Works further argues that "nearly all" of the alleged harassers were co-workers rather than supervisors and that their harassment cannot be imputed to Southeast Works because Burgos failed to take sufficient actions to report it. Southeast Works cites its own Employee Handbook, which states that "[a]ny employees with questions or concerns about any type of discrimination in the workplace are encouraged to bring these issues to the attention of their immediate supervisor or the Human Resources Director." Southeast Works argues that, although Burgos alleges that she reported numerous incidents to her supervisors in accordance with the policy, her failure to report incidents to the Human Resources Director until the end of her tenure at Southeast Works was an "unreasonabl[e] fail[ure] to take advantage of the employer's preventative measures" and Burgos' claims therefore merit dismissal. See <u>Gorzynski v. Jetblue Airways Corp.</u>, 596 F.3d 93, 105 (2d Cir. 2010). This argument is unpersuasive. Burgos alleges that she made numerous reports through the years to different supervisors, as well as at least one complaint to Southeast Works' compliance hotline. Further, the Human Resources Director's response to Burgos' complaint, including her refusal to meet Burgos outside work to discuss the issue, calls into question whether she was truly receptive to complaints. This raises a "genuine issue of fact . . . as to whether it was reasonable not to pursue other options." <u>See</u> <u>id</u>. ("the facts and circumstances of each case must be examined to determine whether, by not pursuing

other avenues provided in the employer's sexual harassment policy, the plaintiff unreasonably failed to take advantage of the employer's preventative measures").

Accordingly, the motion for summary judgment is denied as to these claims.

2. Age-Based Discrimination

Southeast Works also argues that the age-related comments alleged by Burgos are too few, too separate in time, and too mild to constitute an abusive working environment. Burgos alleges five incidents or comments in support of her age-based discrimination claim:

- In June 2011, a male co-worker suggested that Southeast Works should hire "some young white girls."

- In summer 2011, a younger co-worker told Burgos that, due to Burgos' age, Burgos was working more hours than she could handle, and that she was too old and slow to work.

- In December 2011, Abston asked Burgos, "Are you stupid? Do you know how to use a computer?" when Burgos had trouble logging onto Southeast Works' system.

- Also in December 2011, Abston referred to a group of older women, which included Burgos, as the "hot flash corner."

- A supervisor told a disabled resident that he did not have to work with Burgos because Burgos was old and invisible.

Burgos asserts that these five incidents are sufficient to survive summary judgment on her age-discrimination hostile work environment claim.

"There is no fixed number of incidents that a plaintiff must endure in order to

establish a hostile work environment; rather, we view the circumstances in their totality, examining the nature, severity, and frequency of the conduct." see also Alfano v. Costello, 294 F.3d 365, 379 (2d Cir. 2002)). However, as noted above, the anti-discrimination statutes are not a "general civility code," see Bickerstaff, 196 F.3d at 452, and a few isolated incidents of "boorish or offensive use of language" are generally insufficient to establish a hostile work environment. See Benette, 295 F. Supp. 2d at 251-252. Unlike Burgos' allegations of sex and race-based discrimination, the comments based on age are neither pervasive nor severe. Accordingly, Count 3, Burgos' age-based hostile work environment claim, is dismissed.

**D.    Unlawful Discrimination and Retaliation Claims**

Race discrimination and retaliation claims under Title VII, § 1981, or the ADEA, are subject to the McDonnell Douglas burden-shifting standard. See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106, 110 (2d Cir. 2010) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). To state a *prima facie* case of discrimination, a plaintiff must proffer evidence that (1) she belongs to a protected group; (2) she was qualified for her position; (3) her employer took an adverse action against her; and (4) the adverse action occurred in circumstances giving rise to an inference of race discrimination. Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014). To state a *prima facie* case of retaliation, a plaintiff must proffer evidence that she engaged in a protected activity, such as complaining about discrimination, and that her employer took an adverse action in retaliation. Id. This initial *prima facie* burden has been characterized as "minimal" or "*de minimis*." See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005).

Once an employee makes a *prima facie* case of either discrimination or retaliation, the burden shifts to the employer to give a legitimate, non-discriminatory reason for its actions. See McDonnell Douglas, 411 U.S. at 802. If the defendant provides a nondiscriminatory reason for the adverse employment action, then, under Title VII and § 1981 the plaintiff must present evidence either that "the employer's stated reason for the adverse employment action is entirely pretextual" or that unlawful discrimination was a "motivating factor" in the defendant's employment decision. Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir. 2008). "To avoid summary judgment in an employment discrimination case [under Title VII], the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." Id. at 138 (internal quotation marks omitted). In contrast, under the ADEA, a plaintiff at the third step must present evidence that "age was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 180, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009). With respect to a retaliation claim, the employee's admissible evidence must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Kwan v. Andalex Grp. LLC, 737 F.3d 834, 835 (2d Cir. 2013) (internal quotation marks omitted) (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)).

Southeast Works does not dispute that Burgos belongs to a protected group, that she was qualified for her position as a Residential Trainer, or that she engaged in a

protected activity when she made her DHR complaint, as well as the complaints regarding Abston and Rivera. However, the parties dispute that Burgos has demonstrated that she suffered an adverse employment action and that such actions occurred under circumstances giving rise to an inference of discrimination (for her discrimination claims), or that a causal connection existed between Burgos' protected activity and the adverse actions (for her retaliation claims).

      1. <u>Adverse Employment Action</u>

An employee sustains an "adverse employment action" if she "endures a materially adverse change in the terms and conditions of employment . . . . An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Brown v. City of Syracuse</u>, 673 F.3d 141, 150 (2d Cir. 2012) (citation and quotation marks omitted). Examples that may constitute adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." <u>Sanders v. N.Y. City Human Res. Admin</u>, 361 F.3d 749, 755 (2d Cir. 2004) (quoting <u>Terry</u>, 336 F.3d at 138). Here, the adverse employment actions of which Burgos complains are alleged constructive demotion when she moved to a relief position on July 1, 2009 (which this Court has found to be time-barred), her alleged constructive discharge on May 21, 2012, and an alleged *de facto* unpaid leave during the period in which she was offered no relief shifts, between January 15 and May 6, 2012.

Constructive discharge occurs "when an employer intentionally creates a work

atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily." Edwards v. Huntington Union Free Sch. Dist., 957 F. Supp. 2d 203, 213 (E.D.N.Y. 2013) (internal quotation marks and citations omitted; alteration in original). The constructive discharge standard is "demanding" and it will not be satisfied based on difficult or unpleasant working conditions or the plaintiff's preference to no longer work for her employer. Id. Rather, the plaintiff must present evidence: "(1) that the employer acted deliberately or intentionally in bringing about the complained of work conditions, and (2) that the conditions were 'intolerable.'" Id. (citing Petrosino, 385 F.3d at 229). "[A] plaintiff may prove a constructive discharge by establishing that her employer, rather than acting directly, deliberately made her working conditions so intolerable that she was forced into an involuntary resignation, *i.e.*, so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Dowrich-Weeks v. Cooper Square Realty, Inc., 535 F. App'x 9, 12 (2d Cir. 2013) (internal quotation and punctuation omitted).

Burgos alleges that she was compelled to resign because she feared for her safety due to Rivera's actions and comments and because of Southeast Works' failure to address the workplace harassment and discrimination. Southeast Works argues that it tried to address Burgos' complaints regarding Rivera but that Burgos refused to cooperate. This Court has already determined that Burgos has raised a genuine dispute as to whether it was objectively reasonable to feel that her safety was threatened when Rivera brought a weapon to work. It further finds that Burgos has raised a genuine dispute as to whether Southeast Works made a reasonable attempt to address her complaint regarding Rivera and prior complaints regarding Abston. Burgos

has also alleged that, in conducting the investigation into the Rivera complaint, Southeast Works offered concessions to Rivera and other non-black employees being investigated that were not offered to Burgos. For example, Rivera was offered the opportunity to meet off-site or discuss the complaint against her by phone, while Burgos was only offered the opportunity to meet in person at the location where Rivera worked. This discrepancy in treatment could lead a fact-finder to determine that Southeast Works' failures to address Burgos' complaints "were deliberate and not merely negligent or ineffective." Petrosino, 385 F.3d at 229 (internal quotation marks, citation, and alterations omitted). Accordingly, making all inferences in Burgos' favor, a fact-finder could find that Burgos was constructively discharged under an inference of discrimination.

With respect to the period in which Burgos was offered no relief shifts, Southeast Works contends that Burgos has failed to provide evidence of any deliberate action on its part, since Burgos could have called to request a shift and, as soon as she did make such a request, she was assigned work. Burgos contends that she was never required to request shifts previously, that overtime shifts were given to male employees in contravention of Southeast Works' policies during that period, and that she was only given shifts once Abston, a co-worker about whom she had complained, was no longer responsible for making assignments. Making all inferences in Burgos' favor, these allegations are sufficient to raise a genuine dispute of material fact as to whether Burgos would have been assigned relief shifts if she had sought them, or if this period was a *de facto* unpaid leave imposed by Abston. See generally Hughes v. City of Rochester, 12-CV-6112, 2016 WL 4742321, at *6 (W.D.N.Y. Sept. 12, 2016) (finding

that employer's decision to place plaintiff on unpaid leave was an adverse employment action); <u>Little v. Nat'l Broad. Co.</u>, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (adverse employment action where plaintiff "produced evidence that he incurred an actual loss in income because of lost overtime and that he was forced to work undesirable shifts with an erratic schedule"). This, combined with Abston's alleged discriminatory comments, could allow a fact-finder could to find that Burgos was put on *de facto* unpaid leave under an inference of discrimination.

Accordingly, this Court finds that the record contains sufficient evidence that, if credited, could support a jury's finding that Southeast Works' rationale for Burgos' treatment was a pretext for illegal discrimination based on her race and sex. However, having made all inferences in Burgos' favor, there is insufficient evidence to demonstrate that the "age was the 'but-for' cause of the challenged adverse employment action," as required by the ADEA. <u>See</u> <u>Gross</u>, 557 U.S. at 180. Count 1 is therefore dismissed.

2. <u>Retaliation</u>

Burgos made several complaints regarding Abston's comments in December 2011 and January 2012, including sexual comments and the incident where he asked her if she was "stupid" because she had been unable to log onto a computer, which Burgos took to be an age-discriminatory comment. Burgos also filed her DHR complaint on March 16, 2012, complaining of sex, race, and age-based discrimination and harassment, and complained to Southeast Works' Executive Director by letter about Rivera's "monkey meat" comments on April 24, 2012. These complaints all

constitute protected activities.[5]  Further, the temporal proximity between Burgos

complaints and the alleged adverse employment actions suffice at the *prima facie* stage

to establish a causal connection.  See Cifra v. GE, 252 F.3d 205, 217 (2d Cir. 2001)

("[T]he causal connection needed for proof of a [*prima facie*] retaliation claim can be

established indirectly by showing that the protected activity was closely followed in time

by the adverse action." (internal quotation omitted)); Gorman-Bakos v. Cornell Coop.

Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) ("[A] plaintiff can

indirectly establish a causal connection to support a discrimination or retaliation claim by

showing that the protected activity was closely followed in time by the adverse

employment action." (internal quotation marks and alterations omitted)).

Although Southeast Works has articulated nondiscriminatory rationale for the

alleged adverse actions, Burgos' allegations "cast[ ] significant doubt on that rationale,

leaving a triable issue as to whether [Southeast Works] retaliated against her for

complaining about prohibited discrimination."  Gorzynski, 596 F.3d at 111.  "A jury might

credit all of [Burgos'] proffered evidence, some of it, or none at all.  But that is 'left for

the jury to decide at trial.'"  Kirkland, 760 F.3d at 227 (2d Cir. 2014) (vacating summary

judgment for employer) (quoting Rivera, 743 F.3d at 21 (2d Cir. 2012) (same).  And if at

least some of this evidence is believed by a jury, that jury could also conclude that,

despite Burgos' decision not to seek relief shifts, her *de facto* unpaid leave and

constructive discharge were "'more likely than not based in whole or in part on

discrimination,' and that the unlawful retaliation would not have occurred 'but-for' the

---

[5] Although this Court has found that Burgos' age-discrimination allegations do not rise to the level of an ADEA violation, her age-discrimination complaints would nevertheless constitute a protected activity.  See Wimmer v. Suffolk Cnty. Police Dep't, 176 F.3d 125, 136 (2d Cir. 1999) (noting that an employee's reasonable, good faith belief that he is complaining of conduct he believes rises to the level of a racially hostile work environment would satisfy the "protected activity" prong).

alleged wrongful actions.  Id. (quoting Terry, 336 F.3d at 138 (internal quotation marks omitted)).[6]  Accordingly, this portion of the motion for summary judgment is denied.

## V.    CONCLUSION

Burgos' NYHRL claims, Counts 4, 6, 8, 10, and 12 are dismissed under the election of remedies doctrine.  The ADEA constructive discharge and hostile work environment claims, Counts 1 and 3, are also dismissed.  Otherwise, Southeast Works' motion for summary judgment is denied and Counts 2, 5, 7, 9, 11, and 13 will go forward.

## VI.    ORDERS

IT HEREBY IS ORDERED that Defendant Southeast Works' motion for summary judgment (Docket No. 72) is GRANTED in part and DENIED in part consistent with this order.

SO ORDERED.

Dated: May 31, 2017
Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge

---

[6] Southeast Works argues that the DHR's conclusion that there was no evidence of retaliation should be considered by this Court.  Ordinarily, a determination of the DHR, by itself, does not have *res judicata* effect as to subsequent federal claims unless a state court has reviewed and adopted those findings. See Yan Yam Koo v. Dep't of Buildings of City of N.Y., 218 Fed. App'x 97, 99 (2d Cir. 2007) (summary order) ("preclusive effect attached once the state court reviewed and affirmed the [NY] DHR's finding of no probable cause").  Here, no state court has reviewed the DHR's finding.